# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 14-CV-6668 (JFB) (ARL)

———————————

JEFF S. ROTH,

Plaintiff,

VERSUS

FARMINGDALE PUBLIC SCHOOL DISTRICT,

Defendant.

———————————

**MEMORANDUM AND ORDER**
January 30, 2017

———————————

JOSEPH F. BIANCO, District Judge:

Jeff S. Roth ("Roth" or "plaintiff"), proceeding *pro se* and *in forma pauperis*, filed a Second Amended Complaint ("SAC") against the Farmingdale Union Free School District[1] ("District" or "defendant") on March 28, 2016, alleging that the District violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12112 *et seq.*; and the First and Fourteenth Amendments of the United States Constitution. Plaintiff also asserts various New York State law claims. Specifically, plaintiff alleges that defendant discriminated and retaliated against him by failing to hire him, and that defendant violated plaintiff's rights to Free Speech and Due Process. Plaintiff also claims that defendant slandered him and violated New York's Open Meetings Law and Freedom of Information Law.

By Memorandum and Order dated February 26, 2016 (the "Memorandum and Order"), the Court granted in part and denied in part defendant's motion to dismiss plaintiff's First Amended Complaint ("FAC"). *Roth v. Farmingdale Pub. Sch. Dist.*, No. 14-CV-6668 (JFB) (ARL), 2016 WL 767986 (E.D.N.Y. Feb. 26, 2016). The Court found that: (1) plaintiff's Title VII and ADA claims alleging discrimination were

---

[1] Defendant is incorrectly sued herein as the "Farmingdale Public School District."

barred for failure to exhaust administrative remedies; (2) plaintiff's ADEA claim was barred by the statute of limitations; and (3) plaintiff failed to state a cause of action with respect to his Title VII retaliation claim. *Id*. at *1. However, in an abundance of caution, the Court granted plaintiff leave to re-plead those claims. *Id*. The Court specifically directed plaintiff to provide grounds for equitable tolling and to allege how the events and incidents described in the FAC were taken on the basis of plaintiff's protected status under Title VII, the ADEA, and the ADA, such that a plausible discrimination or retaliation claim exists. *Id*. The Court also dismissed the state slander claim, but granted plaintiff leave to re-plead so as to allege the time, place, and manner of the purportedly false statements, as well as to whom the statements were made. *Id*. Finally, the Court denied defendant's motion to dismiss plaintiff's First and Fourteenth Amendment claims after concluding that plaintiff had stated plausible causes of action.[2] *Id*. at *9-11.

Plaintiff subsequently filed the SAC, and defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the following grounds: (1) plaintiff failed to re-plead his Title VII, ADEA, ADA, and slander claims; (2) plaintiff failed to exhaust his Title VII and ADA discrimination claims; (3) plaintiff's

ADEA claim is (a) barred by the statute of limitations or, alternatively, (b) fails to state a claim; (4) plaintiff failed to state a Title VII retaliation claim; (5) plaintiff failed to state a First Amendment claim; (6) plaintiff failed to state a Fourteenth Amendment Due Process claim; and (7) plaintiff failed to state his New York State law claims.[3]

For the reasons set forth below, defendant's motion is granted. As a threshold matter, the Court determines that plaintiff failed to comply with the Memorandum and Order because he has not sufficiently demonstrated, either in the SAC or in his opposition to the instant motion, that equitable tolling exempts his Title VII, ADEA, and ADA discrimination claims from the exhaustion and limitations bars to justiciability. In addition, the Court determines that there are no material issues of fact that support plaintiff's Title VII retaliation claim, or his Free Speech and Due Process claims. Finally, the Court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's New York claims and dismisses them without prejudice to re-filing in state court.

## I. BACKGROUND

### A. Facts

The following facts are taken from defendant's Rule 56.1 statement[4] ("Def.'s

---

[2] The Court also construed the FAC as not alleging a cause of action under the New York Open Meetings Law, but granted plaintiff leave to assert such a claim in the SAC. *Id*. at *11 n.8.

[3] Since this is a motion for summary judgment, the Court will assume that plaintiff has properly pled his claims and will apply the standard of review set forth *infra* to determine whether there are triable issues of fact. *See Linares v. McLaughlin*, 423 F. App'x 84, 85 (2d Cir. 2011).

---

[4] Rather than submitting a Rule 56.1 Statement of Facts, plaintiff filed a "Rebuttal to Defendant's 108 Points" ("Pl.'s Opp'n," ECF No. 80) that does not comport with Local Civil Rule 56.1. Contrary to the Rule, that document does not contain any citations to underlying evidence and is instead part of an omnibus submission that includes various newspaper articles, assorted correspondence, and documents apparently obtained via a New York Freedom of Information Law request. Although defendant served plaintiff with the "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2

56.1," ECF No. 74), as well as the parties' affidavits and exhibits. Unless otherwise noted, the facts are either undisputed or uncontroverted by admissible evidence. Upon consideration of the motion for summary judgment, the Court shall construe the facts in the light most favorable to plaintiff as the nonmoving party, and will resolve all factual ambiguities in his favor. *See Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2001).

1. Plaintiff's Employment Application with the District

In 2010, plaintiff applied for a provisional Audio Visual Technician position with the District, a job that required minimum qualifications established by the Nassau County Civil Service Commission. (Def.'s 56.1 ¶¶ 1-2; Aff. of Susan M. Gibson ("Gibson Aff."), ECF No. 72, Ex. LL.) Plaintiff was initially interviewed by Barbara Pandolfo ("Pandolfo"), Jeffrey Pritzker ("Pritzker"), and Glen Zakian ("Zakian"), and he had a second-round interview with Pritzker. (Def.'s 56.1 ¶ 3.) After the interview process was complete, Pandolfo,

Pritzker and Zakian recommended that another candidate, Joseph Hassett ("Hassett"), be appointed to the provisional position of Audio Visual Technician. (Def.'s 56.1 ¶ 4.) Pandolfo, Pritzker, and Zakian have attested that they did not know of or consider plaintiff's age, marital status, or arrest record when making their recommendation.[5] (Def.'s 56.1 ¶ 4; Gibson Aff. Exs. MM, NN, OO.)

Shortly thereafter, in or about 2011, a Civil Service Examination was administered to fill permanently the District Audio Visual Technician position, and both plaintiff and Hassett applied. (Def.'s 56.1 ¶ 6; Gibson Aff. Ex. LL.) Following the examination, Hassett finished tied for seventh out of the fourteen applicants, and plaintiff finished tied for twelfth. (Def.'s 56.1 ¶ 10.) The District offered a probationary appointment for the position of Audio Visual Technician to Hassett, who accepted and was appointed

(*see* ECF No. 75), plaintiff has failed to submit any other evidence. Moreover, plaintiff did not respond to several of the numbered paragraphs in defendant's 56.1, and many of his replies are non-responsive to defendant's statements.

Generally, a party's "'failure to respond or contest the facts set forth by the [moving party] in [its] Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed.'" *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 139 (S.D.N.Y. 2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04-CV-2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)

(exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Accordingly, in the exercise of its broad discretion and given plaintiff's *pro se* status, the Court will overlook these defects and will deem admitted only those facts in defendants' Rule 56.1 Statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy*, 292 F. Supp. 2d at 504.

[5] Plaintiff does not dispute this in his opposition, but merely states, *inter alia*, that "at the time the interview[s] were being conducted it was known that the district was going to be transferring the audiovisual department from under Pandolfo Director of Libraries to the newly hired Director of Technology." (Pl.'s Opp'n at 14.) This is not responsive to defendant's 56.1 and, thus, does not create a material issue of fact for trial.

on or about October 13, 2011. (Def.'s 56.1 ¶¶ 12-13; Gibson Aff. Ex. LL.)

2. Plaintiff's 2007-2013 Interactions with District Employees and Board of Education Members

Plaintiff became a member of the District Facilities Advisory Committee in or about 2007 and began attending District Board of Education meetings in 2011. (Def.'s 56.1 ¶¶ 15-16.) In May 2012, plaintiff had a meeting with then-District Board of Education President Shari Bardash-Eivers ("Bardash-Eivers") and other Board of Education trustees at the Farmingdale Public Library, where they discussed audiovisual and information technology issues in the District. (Def.'s 56.1 ¶ 17; Gibson Aff. Ex. PP.) On or about May 16, 2013, Bardash-Eivers received an email from a District employee informing her that plaintiff had appeared at the District High School during a student music rehearsal and asked students and District employees questions about ideas for new technology and equipment. (Def.'s 56.1 ¶ 19; Gibson Aff. Ex. PP.) Shortly thereafter, plaintiff attempted to enter the High School auditorium during a student concert, and when security personnel told plaintiff to leave, he refused. (Def.'s 56.1 ¶¶ 20-21; Gibson Aff. Exs. I, PP.)

On or about May 23, 2013, District Superintendent of Schools John Lorentz ("Lorentz") sent plaintiff a letter directing plaintiff to send all communications to the District to Lorentz's office. (Def.'s 56.1 ¶ 22; Gibson Aff. Ex. BB.) The purpose of that correspondence was "to address concerns . . . regarding representations made by [plaintiff], [plaintiff's] interactions with students and staff, and [plaintiff's] presence in District schools." (Gibson Aff. Ex. BB.) The letter stated that it was "not [Lorentz's] intention to create an adversarial relationship with [plaintiff]" or to "interfer[e] with [plaintiff's] right to discuss issues at Board meetings," but said that plaintiff's "actions ha[d] resulted in complaints and appear[ed] to be in derogation of law," and that it was "important that [plaintiff] recognize the[se] concerns [because] [f]ailure to comply with these directives may result in legal action." (Id.)

Nevertheless, on or about May 29, 2013, plaintiff entered an invitation-only Student Award Ceremony to which he had not been invited and was asked to leave. (Def.'s 56.1 ¶ 23; Gibson Aff. Exs. W, QQ.) On or about May 30, 2013, plaintiff left three voicemails on District Board of Education Member Michael Goldberg's ("Goldberg") personal cell phone, and at the end of the second voicemail, plaintiff said: "[G]ive me a call when you have a chance, don't be on a gag order from the District that's retarded." (Def.'s 56.1 ¶ 24; Gibson Aff. Ex. R.) In the third voicemail, plaintiff told Goldberg about the May 23, 2013 letter from Lorentz, but asked if Goldberg would continue speaking with plaintiff despite Lorentz's direction that plaintiff only communicate with the District via Lorentz's office. (Def.'s 56.1 ¶ 25.)

Subsequently, on or about June 14, 2013, plaintiff approached Bardash-Eivers at a post office to discuss the reasons why he should have received the position of Audio Visual Technician in 2010. (Def.'s 56.1 ¶ 26; Gibson Aff. Ex. I.) Plaintiff told Bardash-Eivers that Lorentz was "condescending and cocky and ha[d] it out for" plaintiff, and that "Lorentz need[ed] to go sooner than later." (Id.) Following that interaction, Bardash-Eivers filed a police report concerning plaintiff. (Id.) Further, on or about June 17, 2013, Bardash-Eivers responded to an e-mail plaintiff had sent her and instructed him to

avoid personal contact with her and other District Board Members. (Def.'s 56.1 ¶ 27; Gibson Aff. Exs. I, CC.) In addition, after plaintiff sent a letter to Lorentz and the District Board of Education regarding that e-mail exchange, Bardash-Eivers sent a letter to plaintiff on or about July 3, 2013 stating that his "communications with [her] and District staff ha[d] become increasingly combative"; that plaintiff had "personally confronted [Bardash-Eivers] in a combative manner, which [she] found to be unwarranted and upsetting"; and that "all [future] communications from [plaintiff] must be transmitted through the Superintendent or his office." (Def.'s 56.1 ¶ 28; Gibson Aff. Exs. I, DD.)

Notwithstanding this directive, plaintiff left Bardash-Eivers a voicemail on or about July 9, 2013. (Def.'s 56.1 ¶ 29; Gibson Aff. Ex. I.) Bardash-Eivers attested that plaintiff said that he had received her July 3, 2013 letter and that he

> [was] going to end this little character assassination, questioning [his] intentions, because [his] intentions [were] to improve [District] schools for when [his] children get into [District] schools . . . [T]his character assassination and black propaganda and all this other nonsense, there w[ould] be a meeting of the minds that happens to diffuse this situation . . . [T]hat [was] a fact because [plaintiff's] family and [his] network and [his] invisible network within the community [were] tired of it . . . .

(Gibson Aff. Ex. I.) That same day, plaintiff also sent a letter to Lorentz and the District Board of Education accusing the District of "retaliating" against him. (Def.'s 56.1 ¶ 30; Gibson Aff. Ex. W.) On or about July 10, 2013, Bardash-Eivers sent another letter to plaintiff again instructing him to no longer contact District Board of Education members personally, and to only make inquiries through Lorentz's office. (Def.'s 56.1 ¶ 31; Gibson Aff. Exs. I, EE.) However, on July 11, 2013, plaintiff left a voicemail on Goldberg's cell phone stating that he was not "going to be allowing this type of black propaganda and/or character assassination" to continue. (Def.'s 56.1 ¶ 32; Gibson Aff. Ex. R.) Plaintiff also said that his "invisible network" had supported Goldberg in the last District Board of Education election, and that he would "knock out" some other members during the next election. (*Id.*) The next day, plaintiff left another voicemail for Goldberg saying that he was "done with the idiocracy" and had run out of patience. (Def.'s 56.1 ¶ 33; Gibson Aff. Ex. R.)

On or about August 22, 2013, Plaintiff sent an e-mail to Goldberg and District Board of Education Vice President John Capobianco ("Capobianco") stating that he had received a phone call from a representative of the New York State Board of Education,[6] who said that plaintiff's e-mails to District Board Members were harassing. (Def.'s 56.1 ¶ 35; Gibson Aff. Exs. K, R.) On or about August 28, 2013, plaintiff told a Security Aide at a District Board of Education meeting that Plaintiff had a problem with Lorentz. (Def.'s 56.1 ¶ 36; Gibson Aff. Ex. Y.)

Further, on or about September 3, 2013, plaintiff called Lorentz's secretary several times, and she subsequently filed a police report. (Def.'s 56.1 ¶ 38; Gibson Aff. Ex. J.) The next day, District Assistant

---

[6] Defendant claims that no such organization exists. (Def.'s 56.1 ¶ 35 n.3.)

Superintendent of Business Paul Defendini ("Defendini") reported plaintiff's behavior to Nassau County Police Officer Paul Lamonaca. (Def.'s 56.1 ¶ 39; Gibson Aff. Ex. M.) In that letter, Defendini said that "the [D]istrict had] grown increasingly concerned over the past year regarding a resident. There ha[d] been numerous interactions between this resident, Jeffrey Roth, and Board of Education trustees, Administrators, teachers, security aides and secretaries," and it was the District's "contention that [plaintiff] pose[d] a threat to [its] students and employees." (Gibson Aff. Ex. M.) On or about September 18, 2013, plaintiff attended a public District Board of Education meeting, and other participants complained about his behavior. (Def.'s 56.1 ¶ 41; Gibson Aff. Exs. I, K, R, V.) Bardash-Eivers attested that, during that meeting, plaintiff was disruptive and said that he "ha[d] been coming to meetings for five years busting balls" and "was going to knock Lorentz's teeth out." (Def.'s 56.1 ¶¶ 41-42; Gibson Aff. Ex. I.)[7]

On or about September 27, 2013, plaintiff approached District employee Joseph Glascott ("Glascott"), and after Glascott informed Defendini of that interaction, Defendini filed a police report. (Def.'s 56.1 ¶ 43; Gibson Aff. Ex. M.) Subsequently, on or about October 8, 2013, plaintiff left several voicemails for Capobianco and sent an e-mail to Capobianco and Goldberg. (Def.'s 56.1 ¶¶ 46-48; Gibson Aff. Exs. K, R.) A few weeks later, plaintiff left another voicemail for Goldberg stating that he had performed an unaccompanied security inspection of the District High School. (Def.'s 56.1 ¶ 50;

Gibson Aff. Ex. R.) In addition, on or about October 22, 2013, plaintiff attended a District Parent Teacher Association ("PTA") meeting, where he made references to the Columbine and Sandy Hook school shootings, leading to complaints from other meeting participants. (Def.'s 56.1 ¶ 51; Gibson Aff. Ex. N.)

Further, on or about November 8, 2013, plaintiff entered the custodial office of the District High School and had an altercation with the custodial staff. (Def.'s 56.1 ¶ 54; Gibson Aff. Ex. O.) The next day, plaintiff appeared at Capobianco's private residence and told Capobianco's brother that the District was "all screwed up." (Def.'s 56.1 ¶ 55; Gibson Aff. Ex. K.) That same day, plaintiff also entered the District High School during a student music rehearsal and was asked to leave. (Def.'s 56.1 ¶ 56; Gibson Aff. Ex. M.)

Following these incidents, Lorentz sent plaintiff a letter on or about November 14, 2013 regarding his visits to District property. (Def.'s 56.1 ¶ 57; Gibson Aff. Ex. FF.) That letter advised plaintiff that

> per the District's Code of Conduct, [plaintiff was] prohibited from entering any District school building and/or area unless [he had] an appointment with an Administrator, a staff member, or [was] attending a meeting or event which [was] open to the public. . . . [I]n the event [plaintiff] enter[ed] and/or remain[ed] in school buildings or areas without

---

[7] In his rebuttal, plaintiff argues: "If this occurred then why was the district's surveillance cameras in the cafeteria footage archived to prove their case. Where it is highly suspect Jeff Roth made this statement to a district employee after the series of correspondence which started taking place in May 2013. . . . One would question why a police report was not filed or included for this alleged incident." (Pl.'s Opp'n at 17.) As discussed further *infra*, these speculative statements lack record support and do not create material issues of fact.

authorization, [plaintiff] may be considered a trespasser and law enforcement authorities may be called upon to intervene.

(Gibson Aff. Ex. FF.) However, on or about November 25, 2013, plaintiff entered the District's Howitt Middle School and demanded a meeting with Lorentz. (Def.'s 56.1 ¶ 59; Gibson Aff. Ex. L.) Lorentz and Defendini met with plaintiff, who asked that the District accept a donation from him and his "imaginary network" and hire him as an employee. (Def.'s 56.1 ¶ 60; Gibson Aff. Exs. M, W.)

As a result of these interactions with District administrators, employees, and Board of Education Members, the District reported plaintiff's behavior to the Federal Bureau of Investigation ("FBI") in or about 2013, and the FBI began to monitor plaintiff. (Def.'s 56.1 ¶¶ 62-63; Gibson Aff. Ex. Z.) FBI Special Agent Steven Troy ("Special Agent Troy") attended at least three District Board of Education meetings during the 2014-2015 school year and attested that plaintiff "displayed threatening, intimidating and incongruous behavior." (Gibson Aff. Ex. Z.) Special Agent Troy observed that plaintiff "paced about the room, loudly shouted and attempted to incite others against the Board of Education," and plaintiff "also entered school buildings without authorization, when school was not in session, with no children of his own in attendance and no scheduled business, and photographed the building's infrastructure." (*Id.*) Special Agent Troy attested that "[b]ased upon [plaintiff's] conduct, the FBI recommended that the District set boundaries with regard to [plaintiff's] behavior," and he "recommended the District warn [plaintiff] of

the consequences for failing to comply with the boundaries set by the District and/or its rules and regulations (e.g. ban [plaintiff] from District property) and if [plaintiff] failed to comply, follow through with the consequences." (*Id.*)

### 3. Plaintiff's New York State Human Rights Complaint

On December 16, 2013, plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") and the Equal Employment Opportunity Commission ("EEOC") alleging that he was denied an employment opportunity with the District because of his age, arrest record, and marital status.[8] (Def.'s 56.1 ¶ 95; Gibson Aff. Ex. A.) Specifically, plaintiff alleged that (1) he was "was arrested in 1996 for a DUI," and "[b]ecause of this, [he had] been subjected to unlawful discriminatory actions"; (2) "[b]ased on information and belief, a younger and less qualified person was hired" for the District Audio Visual Technician position; and (3) Bardash-Eivers "made a comment about [plaintiff's] age and marital status" during a May 2012 meeting. (Gibson Aff. Ex. A.)

On June 6, 2014, the DHR dismissed plaintiff's complaint in its entirety for lack of probable cause. (Def.'s 56.1 ¶ 100; Gibson Aff. Ex. B.) The EEOC adopted the findings of the DHR on September 2, 2014 and sent

---

[8] Defendant's 56.1 states that plaintiff filed the DHR complaint on December 11, 2013 (Def.'s 56.1 ¶ 95), but the complaint is file-stamped December 16, 2013 (Gibson Aff. Ex. A).

plaintiff a "Right to Sue" letter. (Def.'s 56.1 ¶ 101; Gibson Aff. Ex. B.)

### 4. Plaintiff's Post-DHR Complaint Interactions with District Employees and Board of Education Members

In January, March, June, and July 2014, plaintiff left several voicemails for Capobianco regarding, *inter alia*, recent school shootings, his DHR complaint, and plaintiff's visits to District property. (Def.'s 56.1 ¶¶ 64-67, 69-73; Gibson Aff. Ex. K.) On or about April 10, 2014, plaintiff called Defendini's secretary and told her that he wanted to "bust [Lorentz's] bald head." (Def.'s 56.1 ¶ 68; Gibson Aff. Ex. Q.) Further, on or about July 27, 2014, plaintiff showed up at Capobianco's private residence to discuss District-related security issues. (Def.'s 56.1 ¶ 74; Gibson Aff. Ex. K.)

In response to this behavior, Lorentz sent plaintiff a letter on or about August 19, 2014 stating that if plaintiff continued "to threaten staff, confront, harass or annoy Board Members, and fail[ed] to comply with the District's Code of Conduct, the Board may be compelled to take action against [plaintiff], *e.g.* prohibiting [plaintiff] from entering any of the District's buildings or grounds of such buildings for a period of time . . . ." (Def.'s 56.1 ¶ 75; Gibson Aff. Ex. GG.) Subsequently, on or about August 20, 2014, Lorentz and Defendini contacted plaintiff to discuss plaintiff's communications with District staff, and during that conversation, plaintiff said that "you don't know what I'm capable of"; "you will hear the lion roar"; and "you will feel the wrath of Roth." (Def.'s 56.1 ¶ 76; Gibson Aff. Exs. M, W.) As a result of plaintiff's

statements, the District evacuated its Administration Building and filed a police report. (*Id.*)

On or about August 26, 2014, plaintiff left Lorentz a voicemail stating that he had lost his temper after receiving the August 19, 2014 letter. (Def.'s 56.1 ¶ 77; Gibson Aff. Ex. W.) The next day, plaintiff attended a District Board of Education meeting and told Lorentz that "God [was] trying to send [Lorentz] a message." (Def.'s 56.1 ¶ 78; Gibson Aff. Ex. W.) As a result, the District sent plaintiff a letter dated September 18, 2014, informing him that he was prohibited from entering District property and having contact with District personnel and Board of Education Members for one month, and advising plaintiff that failure to comply would require the District to treat plaintiff as a trespasser and notify law enforcement. (Def.'s 56.1 ¶ 81; Gibson Aff. Ex. HH.)

Despite this ban, plaintiff attended a Board of Education meeting on District property on or about October 8, 2014, and on or about October 27, 2014, plaintiff entered Howitt Middle School. (Def.'s 56.1 ¶¶ 82-83; Gibson Aff. Ex. O.) Consequently, by letter dated November 7, 2014, the District again prohibited plaintiff from entering District property and having contact with District personnel and Board of Education Members for three months.[9] (Def.'s 56.1 ¶ 85; Gibson Aff. Ex. II.)

In March 2015, plaintiff attended another District Board of Education meeting and sent an e-mail to all Board Members. (Def.'s 56.1 ¶¶ 87-88; Gibson Aff. Exs. I, K, R, V, W, Z.) As a result, on or about March 11, 2015, the District sent plaintiff a third letter

---

[9] Defendant's 56.1 states that this second ban was for one month (Def.'s 56.1 ¶ 85); however, the November 7, 2014 letter sent to plaintiff states that it would last until February 7, 2015 (Gibson Aff. Ex. II), *i.e.* for three months.

prohibiting him entering District property and having contact with District personnel and Board of Education Members until June 30, 2016. (Def.'s 56.1 ¶ 89; Gibson Aff. Ex. JJ.) However, on or about April 14, 2015, plaintiff left Lorentz four voicemails stating that plaintiff was going to "show up to the Board meeting" and "send Lorentz out to lunch permanently if he didn't call [plaintiff] back . . . ." (Def.'s 56.1 ¶ 90; Gibson Aff. Ex. W.) Further, on or about June 28, 2015, plaintiff was arrested for trespassing at Howitt Middle School. (Def.'s 56.1 ¶ 93; Gibson Aff. Exs. M, W.)

Because of these incidents, Lorentz asked the Nassau County District Attorney's Office to secure a temporary order of protection, which was issued on July 13, 2015 by the Honorable Judge Harris of the Nassau County District Court. (Def.'s 56.1 ¶ 94; Gibson Aff. Exs. W, KK.)

### 5. Plaintiff's Facts

As discussed *supra* note 4, plaintiff's 56.1 rebuttal does not comport with Local Civil Rule 56.1 and does not cite any underlying evidence. Moreover, many of plaintiff's responses are argumentative, rather than factual, in nature. Nevertheless, the Court has reviewed the materials plaintiff submitted in opposition to the instant motion and briefly summarizes them below.

Plaintiff's omnibus opposition consists of unorganized newspaper articles that concern, *inter alia*, technology issues in the District, salaries for New York state school district superintendents, and various investigations into Long Island school districts. (Pl.'s Opp'n at 25-55.) In addition, plaintiff has submitted the July 29, 2015 supporting deposition of Vincent Calasso ("Calasso") given to the Nassau County Police

Department, which states that Calasso encountered plaintiff on June 28, 2015 at around 7:15 p.m. at Howitt Middle School, where Calasso worked as a security guard. (*Id.* at 57.) Calasso said that he advised plaintiff to leave the property immediately. (*Id.*) Plaintiff has further submitted largely illegible PowerPoint presentation slides that appear to pertain to various District projects (*id.* at 59-108); minutes from an August 31, 2016 District Board of Education meeting (*id.* at 111-110); and various letters plaintiff sent to District officials (*id.* at 121-137). Finally, plaintiff's opposition includes affidavits and accompanying exhibits submitted to the DHR in response to plaintiff's complaint. (*Id.* at 138-217.)

### B. Procedural History

Plaintiff commenced this action on November 10, 2014 (ECF No. 1) and filed the FAC on July 8, 2015 (ECF No. 25). Defendant filed a motion to dismiss the FAC on August 12, 2015 (ECF No. 28), which the Court granted in part and denied in part on February 26, 2016 (ECF No. 49). The Court also gave plaintiff leave to re-plead those claims that it had dismissed, and plaintiff filed the SAC on March 28, 2016. (ECF No. 60.)

On August 4, 2016, defendant moved for summary judgment. (ECF No. 71.) Plaintiff filed his opposition on September 3, 2016 (ECF No. 80), and the District filed its reply on September 26, 2016 (ECF No. 82). The Court has carefully considered the parties' submissions.

## II. STANDARD OF REVIEW

The standard for summary judgment is well-settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a

motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Rule 56(c)(1) provides that a

> party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

When considering a dispositive motion made by or against a *pro se* litigant, the Court is mindful that a *pro se* party's pleadings must be "liberally construed" in favor of that party and are held to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). The Second Circuit "liberally construe[s] pleadings and briefs submitted by

*pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (citations omitted). Nevertheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (citation omitted).

### III. DISCUSSION

For the reasons that follow, the Court grants the District's motion to dismiss the federal claims in its entirety. As a threshold matter, the Court determines, as a matter of a law, that plaintiff's Title VII and ADA claims alleging gender and disability discrimination are barred due to plaintiff's failure to exhaust administrative remedies, and that plaintiff's ADEA claim is barred by the statute of limitations. Accordingly, the Court need not, and does not, discuss whether there are materials issues of fact concerning those claims. In addition, the Court determines that no rational fact-finder could find for plaintiff on his Title VII retaliation claim, or his First and Fourteenth Amendment claims. Finally, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.

A. Failure to Exhaust

As it did on its motion to dismiss the FAC, the District argues that plaintiff's Title VII and ADA claims alleging gender and disability discrimination are barred due to plaintiff's failure to exhaust administrative remedies. Specifically, defendant argues that plaintiff never raised claims of gender or

disability discrimination in his DHR complaint, and that such allegations are unrelated to any claims asserted in that administrative proceeding. Thus, defendant argues that the Title VII claim based on gender and the ADA claim based on disability are unexhausted, and that summary judgment on those claims is warranted. As set forth below, the Court agrees.

1. Applicable Law

Generally, to bring a Title VII discrimination claim in federal district court, a plaintiff must first exhaust his administrative remedies by "filing a timely charge with the EEOC or with 'a State or local agency with authority to grant or seek relief from such practice.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (quoting 42 U.S.C. § 2000e-5(e)). The same procedures apply for ADA employment discrimination claims. *See* 42 U.S.C. § 12117(a) (ADA employment discrimination procedures shall include those set forth at 42 U.S.C. § 2000e-5(e)).

However, "'claims that were not asserted before the EEOC [or an appropriate State or local agency] may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam)). "Reasonably related conduct is that which 'would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001)).[10] In determining whether

---

[10] Two other kinds of claims may be considered "reasonably related": those alleging "'an employer's

retaliation for filing an EEOC charge,'" and those alleging "'further incidents of discrimination carried

a claim is "reasonably related" to the EEOC charge, "'the focus should be on the factual allegations made in the [EEOC] charge itself'" and on whether those allegations "gave the [EEOC] 'adequate notice to investigate'" the claims asserted in court. *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Deravin v. Kerik*, 335 F.3d 195, 201-02 (2d Cir. 2003)).

## 2. Analysis

As discussed above, plaintiff's DHR complaint indicates that he was discriminated against based on his age, arrest record, and marital status. (Gibson Aff. Ex. A.) The DHR complaint is devoid of any reference to gender, sex, or disability discrimination, and the Court previously determined in the Memorandum and Order that discrimination on the basis of gender, sex, and disability are not "reasonably related" to plaintiff's claims that defendant discriminated against him on the basis of his age, marital status, or arrest record.[11] 2016 WL 767986, at *6 (citing *Petty v. City of New York*, No. 10-CV-8581 (KPF), 2014 WL 6674446, at *10 (S.D.N.Y. Nov. 25, 2014) (finding that claims of race and disability discrimination were not reasonably related to allegations of discrimination based on arrest record that were raised in administrative complaint);

*DiProjetto v. Morris Protective Serv.*, 306 F. App'x 687, 688 (2d Cir. 2009) (finding that claims of race, gender, and disability discrimination were not reasonably related to allegations of national origin discrimination raised in EEOC charge)). Accordingly, plaintiff has failed to exhaust his administrative remedies with respect to the Title VII claim based on gender or sex and the ADA claim based on disability. As a result, in the Memorandum and Order, the Court dismissed those claims because plaintiff did not file an administrative complaint within 300 days of the conduct at issue. *Id.* (citing *Goodwin v. Solil Mgmt. LLC*, 10-CV-5546 (KBF), 2012 WL 1883473, at *4 (S.D.N.Y. May 22, 2012); 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117). However, in an abundance of caution, the Court granted plaintiff leave to re-plead and specifically directed him "to provide a basis for equitable tolling (if such a basis exists) for his failure to exhaust . . . ." *Id.* at *7. The Court said that the SAC "must explain why equitable principles should excuse [plaintiff's] failure to file an administrative charge concerning the Title VII and ADA claims within 300 days of the alleged discriminatory conduct." *Id.*

Equitable tolling "is granted when 'rare and exceptional circumstances' prevented a

---

out in precisely the same manner alleged in the EEOC charge.'" *Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 458 (2d Cir. 2009) (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993), *superseded by statute on other grounds*). Neither is at issue in this case.

[11] To the extent that plaintiff alleges in the SAC that he was discriminated against on the basis of marital status or arrest record, such claims are not cognizable under Title VII. "Federal law does not protect individuals against discrimination based on criminal history." *Witharana v. NYC Taxi Limousine Comm'n*, No. 13-CV-4338 (ENV) (MDG), 2013 WL 5241987, at *2 (E.D.N.Y. Sept. 17, 2013); *see also Parks v. New York City Dep't of Corr.*, 253 F. App'x 141, 143 (2d Cir. 2007) (holding that "the District Court correctly concluded that Title VII does not cover alleged discrimination on the basis of an employee's arrest record.") Further, "Title VII does not protect against discrimination on the basis of marital status alone," though a claim of marital status discrimination is cognizable under N.Y. Executive Law § 296. *Fertig v. HRA Med. Assistance Program*, No. 10-CV-8191 (RPP), 2011 WL 1795235, at *3 (S.D.N.Y. May 6, 2011); *see also Singh v. New York State Dep't of Taxation & Fin.*, 911 F. Supp. 2d 223, 233 n.3 (W.D.N.Y. 2012) (noting that marital status is not a protected class under Title VII).

plaintiff from filing on time." *Williams v. Potter*, No. 06 Civ. 8258 (LAP), 2007 WL 2375818, at *5 (S.D.N.Y. Aug. 14, 2007) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)). "When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has 'acted with reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003) (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002)). The doctrine is "highly case-specific," and the "burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." *Boos v. Runyon*, 201 F.3d 178, 184-85 (2d Cir. 2000).

Only in a limited number of cases do extraordinary circumstances exist such that equitable tolling is warranted. *See South v. Saab Cars USA, Inc.*, 28 F.3d 9, 12 (2d Cir. 1994) (principles of equitable tolling do not extend to what "is at best a garden variety claim of excusable neglect" (citation omitted)). Such cases include those where a plaintiff's mental or physical disability prevented him from handling his legal affairs. *See, e.g.*, *Tsai v. Rockefeller Univ.*, 137 F. Supp. 2d 276, 281-83 (S.D.N.Y. 2001); *accord Canales v. Sullivan*, 936 F.2d 755, 756 (2d Cir. 1991) ("[M]ental impairment may warrant equitable tolling of the statute of limitations under some circumstances."). Nevertheless, "few medical difficulties actually qualify for equitable tolling." *Kantor-Hopkins v. Cyberzone Health Club*, No. 06-CV-643 (DLI) (LB), 2007 WL 2687665, at *6 (E.D.N.Y. Sept. 10, 2007); *see, e.g.*, *Ferrer v. Potter*, No. 03 Civ. 9113 (AJP), 2005 WL 1022439, at *8 (S.D.N.Y.

May 3, 2005) (holding that death of plaintiff's father was insufficient reason for equitable tolling); *Jenkins v. Potter*, 271 F. Supp. 2d 557, 564 (S.D.N.Y. 2003) (holding union representative's "wife's terminal illness" not sufficiently "extraordinary" circumstance to justify equitable tolling); *Chalom v. Perkins*, No. 97 Civ. 9505 (LAP), 1998 WL 851610, at *6 (S.D.N.Y. Dec. 9, 1998) ("Even if [plaintiff] did offer proof of the mental grief she alludes to, it would not reach the high standard that this circuit has applied."); *Pauling v. Sec'y of Dep't of Interior*, 960 F. Supp. 793, 804 n.6 (S.D.N.Y. 1997) (holding that plaintiff's claim that he was suffering from a "major depressive episode" did not excuse his failure to exhaust administrative remedies when the medical evidence "indicat[ed] only that he was too ill to work, not that he was too ill to comprehend his rights and to file a complaint"); *Decrosta v. Runyon*, Nos. 90-CV-1269, 90-CV-585, 1993 WL 117583, at *3 (N.D.N.Y. Apr. 14, 1993) (holding that equitable tolling was not warranted, despite doctor's statement that the plaintiff was "suffering from a major depressive disorder that was more serious than a neurosis and his overall ability to function in society was severely limited," when other testimony from doctors demonstrated that plaintiff could care for himself, comprehend problems with his employment, and had retained an attorney regarding his legal remedies).

Here, plaintiff has failed to carry his burden. His opposition does not rebut defendant's argument that equitable tolling is inapplicable to plaintiff's claims, and the SAC merely states that:

> It is Jeff Roth's argument of why the claim should be subject to equitable tolling is that other cases which set legal precedents were decided such "Cyr v. Addison Rutland Supervisory

Union" or the Carin Mehler v. Rye City School or the Mount Vernon School District's controversy with their administrators contracts had yet to occur.

It is Jeff Roth's argument that it could be argued that the timing was delayed in order to wait for he knew other examples to occur in the future which would support Jeff Roth's complaint and need for education reform to bring to the public's knowledge of how their school tax money is being wasted and in some instances their community being defrauded.[12]

(SAC at 6.)

These assertions do not demonstrate the appropriateness of equitable tolling, and after conducting an independent review of the record, the Court concludes that no such justification exists.[13]  In particular, the Court notes that plaintiff filed his DHR complaint despite his disability,[14] and thus, there is no basis for concluding that plaintiff's disability prevented him from raising gender and disability-based discrimination claims in that administrative proceeding.  *See Thomas v. Burmax Co.*, No. 12-CV-6363 (JFB) (ARL), 2013 WL 6681616, at *5 (E.D.N.Y. Dec. 18, 2013) (holding that plaintiff could not claim disability-based equitable tolling where the disability did not prevent filing of EEOC

complaint).  Plaintiff's seeming contention that it was necessary for him to wait for additional conduct by the District pertaining to tax expenditures—conduct that bears no relation to his discrimination claims—is meritless.

Accordingly, because plaintiff failed to administratively exhaust his Title VII and ADA discrimination claims and has not adduced facts showing why equitable tolling should apply, those claims are barred from judicial review as a matter of law, and defendant is entitled to summary judgment.[15]

B.  Statute of Limitations

Defendant again argues that plaintiff's ADEA claim alleging discrimination on the basis of age in connection with his application for the Audio Visual Technician position should be dismissed because it is barred by the statute of limitations.  As set forth below, the Court agrees.

1.  Applicable Law

To assert an ADEA claim in federal court, a plaintiff must file an administrative charge alleging discrimination within 300 days of the alleged discriminatory conduct. *O'Grady v. Middle Country Sch. Dist. No. 11*, 556 F. Supp. 2d 196, 199 (E.D.N.Y. 2008) (citing *Ruhling v. Tribune Co.*, No. 04-CV-2430 (ARL), 2007 WL 28283, at *8

---

[12] The Court has excerpted the SAC verbatim and has not noted spelling or grammatical errors.  Although these statements are included under the "Count 1: Violation of the First Amendment to the United States Constitution" heading, the Court will consider them in the context of plaintiff's Title VII and ADA discrimination claims for purposes of the instant motion.

[13] The Court was able to identify only of the cases that plaintiff appears to cite, *Cyr v. Addison Rutland*

*Supervisory Union*, 955 F. Supp. 2d 290 (D. Vt. 2013), which does not address equitable tolling.

[14] In the SAC, plaintiff states that he suffers from "PTSD Panic Anxiety Disorder."  (SAC at 8.)

[15] Consequently, the Court need not, and does not, discuss whether there are material issues of fact pertaining to those claims.

(E.D.N.Y. Jan. 3, 2007) ("Under Title VII and the ADEA, a plaintiff must file an administrative charge . . . within 300 days after a claim accrues.")). This statutory filing period is "analogous to a statute of limitations," *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996), and, as such, "a failure to timely file a charge acts as a bar to a plaintiff's action," *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 00-CV-6307 (KMK), 2007 WL 259937, at *6 (S.D.N.Y. Jan. 29, 2007); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006). "This period begins to run for each discrete discriminatory act when each such act occurs." *O'Grady*, 556 F. Supp. 2d at 199.

2. Analysis

Plaintiff filed his DHR complaint on December 16, 2013. Thus, the 300-day window commenced on February 19, 2013. However, plaintiff contended in his DHR complaint that he was discriminated against in 2011, when a "younger and less qualified person" was hired for the District's audio technician position. (Gibson Aff. Ex. A.) Accordingly, the Court concluded in the Memorandum and Order that "[a]n allegation of discrimination in 2011 (or perhaps even earlier in December 2010 as indicated elsewhere in the [FAC]), is plainly outside of the 300-day actionable window, and thus, untimely." 2016 WL 767986, at *8. Nevertheless, the Court again granted

plaintiff leave to re-plead his ADEA claim so as to allege equitable tolling.[16] *Id.*

In the SAC, plaintiff argues that:

It is Jeff Roth's contention that the statute of limitation on the timeliness of disclosing his disability of PTSD Panic Anxiety Disorder in the Nassau Commission of Human Rights original complaint was that then it would discredit the seriousness of the constitutional rights violations whereas then the commission not seriously consider investigating his complaint.

It is Jeff Roth's contention that the statute of limitation on the timeliness of disclosing in his complaint original complaint when filed was his belief the district or one of their employees would reference his disability proving the slanderous defamation emanating from the district. . . .

It is Jeff Roth's contention that the statute of limitation on the timeliness of disclosing in his complaint original complaint when filed due to the fact that his disability was not properly documents at the time of filing. Jeff Roth currently has a disability appeal which was filed May 2015 with the Social Security Administration.[17]

---

[16] The Court also noted that because "[a] federal cause of action for age related employment discrimination under the ADEA is statutorily available only to individuals over forty years of age at the time of the alleged discriminatory action," *Manko v. Deutsche Bank*, No. 02-CV-10180 (TPG), 2004 WL 574659, at *7 (S.D.N.Y. Mar. 22, 2004) (citing 29 U.S.C. § 631(a)), *aff'd*, 354 F. App'x 559 (2d Cir. 2009), plaintiff's ADEA claim must pertain to conduct

that occurred in 2011, when he turned forty-years old, or later. 2016 WL 767986, at *8.

[17] The Court has excerpted the SAC verbatim and has not noted spelling or grammatical errors. Although these statements are included under the "Count 5: The Violation of ADA Americans with Disabilities and Arrest Record" heading, the Court will consider them in the context of plaintiff's ADEA claim for purposes of the instant motion.

(SAC at 8.) Plaintiff's opposition does not address defendant's argument that equitable tolling does not save his ADEA claim from the limitations bar.

Under the equitable principles set forth above, plaintiff has again failed to carry his burden of establishing entitlement to equitable tolling, and the Court finds no basis for applying that doctrine in the record. Reading the SAC liberally, plaintiff appears to argue that his disability prevented him from timely filing the DHR complaint. However, as previously noted, "few medical difficulties actually qualify for equitable tolling." *Kantor-Hopkins*, 2007 WL 2687665, at *6; *see, e.g.*, *Decrosta*, 1993 WL 117583, at *3 (holding that equitable tolling was not warranted, despite doctor's statement that the plaintiff was "suffering from a major depressive disorder that was more serious than a neurosis and his overall ability to function in society was severely limited," when other testimony from doctors demonstrated that plaintiff could care for himself, comprehend problems with his employment, and had retained an attorney regarding his legal remedies). Plaintiff does not contend, and there is nothing in the record that shows, that his disability impaired his ability to file an administrative charge prior to February 19, 2013. *See Thomas*, 2013 WL 6681616, at *5 (holding that although plaintiff alleged that "he suffered from depression and post-traumatic stress disorder, could not care for himself, and struggled 'each day to just get by' since his termination . . . the Court [could not] conclude that plaintiff's circumstances following his termination were so extraordinary that they warrant equitable tolling. Simply put, plaintiff has failed to show how his mental and physical disabilities actually prevented him from filing a timely charge of discrimination with the EEOC"). Plaintiff's argument that "disclosing his disability of PTSD Panic Anxiety Disorder in the Nassau Commission of Human Rights original complaint . . . would [have] discredit[ed] the seriousness of the constitutional rights violations" is baseless and does not constitute an "extraordinary circumstance" sufficient to warrant equitable tolling.

Therefore, the Court holds that the statute of limitations bars plaintiff's ADEA claim, and that no basis for equitable tolling has been shown; thus, defendant is entitled to summary judgment.[18]

## C. Title VII Retaliation

Defendant argues that plaintiff's Title VII retaliation claim fails as a matter of law because there are no facts showing that plaintiff engaged in protected activity or opposed an employment practice made unlawful by Title VII, or that defendant was aware of such activity. As set forth below, the Court agrees.

### 1. Applicable Law

The Court evaluates a Title VII retaliation claim under the three-step, burden-shifting framework used for an adverse employment claim, as established by *McDonnell Douglas Corporation. v. Green,* 411 U.S. 792 (1973). First, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a

---

[18] Consequently, the Court need not, and does not, discuss whether there are material issues of fact pertaining to those claims.

causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). In determining whether a plaintiff has satisfied this initial burden, the Court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action, and if the defendant carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by the defendant were a pretext for retaliatory animus based upon protected Title VII activity. *See Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

The Court notes that Title VII protects not only those employees who opposed employment practices made unlawful by the statute, but also those who have "a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law'" even if those actions did not. *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001) (quoting *Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)). Finally, the Supreme Court has defined an "adverse employment action" in the Title VII retaliation context (distinct from and broader than the standard in the Title VII discrimination context) to mean an action that is "materially adverse" and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). The Supreme Court has noted that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

2. Analysis

Here, plaintiff has failed to establish a *prima facie* case of retaliation. Specifically, plaintiff does not argue—and there are no facts that show—that he engaged in any protected activity, or that any such activity was known by the District. The only mention of plaintiff's conduct before he applied for the Audio Visual Technician position is his allegation in the DHR complaint that he advocated for better security and surveillance systems, solar panels, and energy efficient stage lighting to be installed in 2010. (Gibson Aff. Ex. A.) Such actions do not constitute protected activity under Title VII because plaintiff has not demonstrated that he "'had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII.'" *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d. Cir. 2006) (quoting *McMenemy*, 241 F.3d at 285). Thus, even in light of plaintiff's *pro se* status and drawing all inferences in his favor, the Court identifies nothing in the record that would allow a rational juror to find for plaintiff on his Title VII retaliation claim. *See, e.g.*, *Campbell v. N.Y. City Transit Auth.*, 93 F. Supp. 3d 148, 175-79 (E.D.N.Y. 2015), *aff'd*, No. 15-1103-CV, 2016 WL 6069229 (2d Cir. Oct. 17, 2016) (granting summary judgment because *pro se* plaintiff failed to establish *prima facie* retaliation case); *Sherman v. Nat'l Grid*, 993 F. Supp. 2d 219, 227-28 (N.D.N.Y. 2014) (granting summary judgment to defendant on Title VII retaliation claim notwithstanding "special solicitude" shown to *pro se* plaintiff).

Accordingly, defendant is entitled to summary judgment on the Title VII retaliation claim.

## D. First Amendment Claim

In the SAC, plaintiff challenges his exclusion from District property because that ban "impermissibly burdened [plaintiff's] ability to express himself, attend adult education classes, obtain information, and participate in the political process, and has thereby violated the First Amendment." (SAC at 5.) In addition, plaintiff states that he "engage[d] in protected activity where he possessed firsthand knowledge of public concern and the enclosed letters to local politicians, government entities, and discussions with district's board of education members . . . ." (*Id.*)

In the instant motion, defendant argues that "plaintiff's speech was not protected because he was continually threatening and harassing [Board of Education] members and District administrators at the time his suspension occurred," and that defendant banned plaintiff for that behavior, rather than on account of protected conduct. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Br."), ECF No. 73, at 18-19.) As set forth below, the uncontroverted evidence shows that plaintiff's speech was threatening and therefore not entitled to constitutional protection, and there is no evidence in the record from which a rational jury could find that the District's decision to ban plaintiff was motivated by plaintiff's constitutionally-protected activities. Consequently, there are no triable issues of fact with respect to plaintiff's First Amendment claim.

### 1. Applicable Law

"To recover on a [F]irst [A]mendment claim under § 1983, a plaintiff must demonstrate that his conduct is deserving of [F]irst [A]mendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by his exercise of free speech." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987) (citation omitted); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("To prevail on this free speech claim, plaintiff must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.").

"Freedom of speech, however, is not an unfettered right for any U.S. citizen. Speech that constitutes a true threat of violence, by being a 'serious expression of an intent to cause present or future harm,' may be prohibited." *D.F. ex rel. Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 386 F. Supp. 2d 119, 125 (E.D.N.Y. 2005) (quoting *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004)), *aff'd sub nom. D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 180 F. App'x 232 (2d Cir. 2006). This prohibition is intended to "protect[] individuals from the fear of violence, the disruption that fear engenders, and the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992). Thus, "[t]he speaker need not actually intend to carry out the threat." *Virginia v. Black*, 538 U.S. 343, 359-60 (2003).

2. Analysis

In the Memorandum and Order, the Court concluded that plaintiff had stated a plausible Free Speech claim and noted parenthetically that "[t]o the extent that defendant argues that plaintiff was banned from school property due to threats of violence, which are not protected by the First Amendment . . . [s]uch a factual dispute . . . cannot be resolved on a motion to dismiss." 2016 WL 767986, at *10 n.6. Upon review of the evidence, the Court now concludes that there are no triable issues of material fact regarding whether plaintiff engaged in protected conduct, or whether defendant's actions were motivated by plaintiff's exercise of his Free Speech rights. *See Linares*, 423 F. App'x at 85 (observing that "different standards apply to Rule 12(b)(6) motions to dismiss and Rule 56 motions for summary judgment"). On the contrary, the uncontroverted evidence demonstrates that plaintiff's threatening behavior, which occurred over approximately sixteen months despite repeated warnings by District officials, led to his ouster from District property. Further, the only finding a rational jury could reach (even when construing the evidence most favorably to plaintiff) is that the ban was motivated by defendant's legitimate concern for the safety of District administrators, employees, students, and Board of Education members.

In his opposition, plaintiff argues that the

disagreement between Jeff Roth and the district did not cumulate until in May 2013, when publically he was making his advocacy for technology improvements known instead of it being discussed internally within the Facility Advisory Committee. Once Jeff Roth began exercising his freedom of speech at public board of education meetings criticizing and expressing his educated opinion of the districts inadequacies in technology compared to other education technology projects he completed, the previous board retaliated against him.

(Pl.'s Opp'n at 2.) Plaintiff also claims that the "[D]istrict had a complacent attitude toward security technology," and that "[t]his was one of the many inadequacies and non-compliance security issues Jeff Roth would state publically at the board of education meetings." (*Id.* at 3.) Thus, plaintiff appears to contend that defendant banned him from District property in retaliation for his outspokenness regarding its education and safety technology.

However, the uncontroverted facts show that the District did not first prohibit plaintiff from entering District buildings and grounds until September 18, 2014 (*see* Gibson Aff. Ex. HH), several years after plaintiff, by his own admission, began attending District Board of Education meetings in 2011, where he "state[d] his opinion and suggestions during the public speaking portion" (SAC at 4; *see also* Def.'s 56.1 ¶¶ 15-16). In addition, plaintiff does not contest that he met with Bardash-Eivers and other District officials in May 2012 to discuss audiovisual and information technology issues in the District. (Def.'s 56.1 ¶ 17; Gibson Aff. Ex. PP.) Thus, the record is clear that plaintiff vocalized his opinions and suggestions on District technology issues well before defendant instituted the contested ban.

Moreover, the evidence before this Court—much of which plaintiff has failed to refute by responding to portions of defendant's 56.1 statement or adducing contrary facts—evinces a long course of

contumacious and combative conduct by plaintiff. Specifically, plaintiff has not denied that: Lorentz sent him a May 23, 2013 letter directing plaintiff to send all communications to the District to Lorentz's office because of "concerns . . . regarding representations made by [plaintiff], [plaintiff's] interactions with students and staff, and [plaintiff's] presence in District schools" (Def.'s 56.1 ¶ 22; Gibson Aff. Ex. BB); despite that letter, plaintiff attended an invitation-only Student Award Ceremony on May 29, 2013 and left several voicemails for Goldberg the next day (Def.'s 56.1 ¶¶ 23-25); on or about June 14, 2013, plaintiff confronted Bardash-Eivers at a post office and voiced his displeasure with Lorentz, causing Bardash-Eivers to file a police report and to direct plaintiff to send all District-related communications to Lorentz's office because his "communications with [her] and District staff ha[d] become increasingly combative" (Def.'s 56.1 ¶¶ 26-28; Gibson Aff. Ex. DD); and that plaintiff nevertheless left subsequrnt voicemails for Bardash-Eivers and Goldberg (Def.'s 56.1 ¶¶ 29, 32-33).

In addition, defendant has provided a plethora of correspondence and affidavit testimony concerning defendant's behavior at District Board of Education meetings and repeated phone calls to and in-person interactions with District officials. Those uncontroverted materials demonstrate repetitive menacing behavior on the part of plaintiff, who, *inter alia*, stated at a District Board of Education meeting that he "was going to knock Lorentz's teeth out" (Def.'s 56.1 ¶¶ 41-42); referenced the Columbine and Sandy Hook school shootings at a PTA meeting (*id.* ¶ 51); had an altercation with custodial staff at a District High School (*id.* ¶ 54); threatened to "bust [Lorentz's] bald head" (*id.* ¶ 68); twice appeared at

Capobianco's home (*id.* ¶¶ 55, 74); and told Lorentz and Defendini that they would feel the "wrath of Roth" (*id.* ¶ 76). This conduct led District officials and employees to file multiple police reports (*see, e.g.*, *id.* ¶¶ 26, 38, 39); report plaintiff to the FBI (*id.* ¶¶ 62-63); evacuate the District Administration Building (*id.* ¶ 76); and send plaintiff five warning letters (*id.* ¶¶ 22, 28, 31, 57, 75). Defendant took all of these prophylactic steps prior to first restricting plaintiff from entering District property on September 18, 2014, well more than a year after Lorentz's initial letter to plaintiff on May 23, 2013 directing him to limit his communications to Lorentz's office. However, the uncontroverted evidence shows that, despite that ban and successive embargos, plaintiff continued to enter District buildings and grounds and accost District administrators and employees, leading to his arrest for trespassing and an order of protection against him. (*Id.* ¶¶ 93-94.)

In response to these facts put forth by defendant, plaintiff asserts that "[t]he attempt to decide who is telling the truth or who is remembering the versions of events more accurately, with only relying on words written in the thousands of documents would be an illusionary justice," and that this case "deserves to be contemplated before a jury of Long Island public school tax payers." (Pl.'s Opp'n at 2.) He further argues that if

> plaintiff is permitted to cross examine the alleged witnesses who were directed to sign affidavits the defendant crafted, it would be clear who is distorting the truth. It is Jeff Roth's allegation that district employees had a reasonable fear of retaliation if they did not sign the affidavits as directed and this will be

clearly revealed upon cross examination.

It is Jeff Roth's allegation that the certain employees signed the affidavits in order to protect their continued abuse of overtime, which was confirmed from the salary decrease of the audio visual supervisor.

(*Id.* at 2-3.) Finally, plaintiff states that "[t]here is an issue of credibility where these are 'he said she said' scenarios questioning who has more credibility with irrational logic such as the district not producing actual recordings of the 'disturbing threatening behavior' at the public board meetings after three 'suspensions'." (*Id.* at 8.)

These arguments, which lack any evidentiary support, are unavailing because "'[t]he assertion that trial will bring forth evidence is not sufficient to defeat summary judgment.'" *Gunn v. United Parcel Serv., Inc.*, No. 14-CV-6951 (JFB) (SIL), 2016 WL 4523913, at *10 (E.D.N.Y. Aug. 22, 2016) quoting *Portee v. Deutsche Bank*, No. 03 Civ. 9380 (PKC), 2006 WL 559448, at *8 (S.D.N.Y. Mar. 8, 2006)); *see also Ying Ring Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) ("If facts essential to support opposition to the summary judgment motion are not available, the nonmoving party may seek a continuance under Rule 56(f) to permit affidavits to be obtained or discovery to be had, but may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."); *Rodriguez*, 209 F. Supp. 2d at 348 ("[A] *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment."). Based on the uncontroverted facts set forth above (which include letters, e-

mails, and an order of protection), the Court determines that no rational juror could find that defendant engaged in protected conduct, or that defendant's decision to exclude plaintiff from District property was motivated by plaintiff's exercise of his Free Speech rights.

With respect to the first prong, as previously noted, threats of violence are not secured by the First Amendment. *See, e.g.*, *R.A.V.*, 505 U.S. at 388; *D.F. ex rel. Finkle*, 386 F. Supp. 2d at 125. Moreover, the Supreme Court and the Second Circuit have specifically recognized that menacing conduct in a school setting does not enjoy constitutional aegis. *See Morse v. Frederick*, 551 U.S. 393, 425 (2007) (Alito, J., concurring) ("[D]ue to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence."); *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 115 (2d Cir. 2012) ("School administrators also have to be concerned about the confidence of parents in a school system's ability to shield their children from frightening behavior and to provide for the safety of their children while in school."). Accordingly, other courts have correctly dismissed First Amendment claims based on conduct by school officials taken in response to threatening statements. *See, e.g.*, *Lovern v. Edwards*, 190 F.3d 648, 655-56 (4th Cir. 1999) (holding that "[s]chool officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property," and finding that banning parent from school property was not unconstitutional because of parent's "continuing pattern of verbal abuse and threatening behavior towards school officials"); *Milo v. City of N.Y.*, 59 F. Supp. 3d 513, 527 (E.D.N.Y. 2014) (holding that

teacher's "exclamation to school staff, inside a school filled with students and teachers, that 'if [she] had a trench coat and a shotgun, it would be Columbine all over again,'" was not constitutionally protected); *D.F. ex rel. Finkle*, 386 F. Supp. 2d at 125 (holding that student's "story, with its graphic depictions of the murder of specifically named students and sex between named students" was not constitutionally protected).

In the instant case, as summarized above, there is uncontroverted evidence that plaintiff engaged in repeated acts of threatening behavior, conduct that is not shielded by the First Amendment, and the Court is mindful that New York "school boards [] exercise ultimate authority for access to students, school buildings and school property . . . ." *See Lloyd v. Grella*, 83 N.Y.2d 537, 547 (1994). It is not the judiciary's prerogative "to second-guess with hindsight the judgment of school administrators . . . ." *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 481 (E.D.N.Y. 2009), *aff'd*, 623 F.3d 71 (2d Cir. 2010); *see also Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion."). Thus, based on the record before this Court, no rational juror could find that the District improperly viewed plaintiff's conduct as a danger to District officials, staff, and students.

Moreover, plaintiff cannot show that defendant banned him from District property in response to his Free Speech activities concerning education technology. On the contrary, "the undisputed facts demonstrate the existence of a longstanding directive" that plaintiff refrain from combative confrontations with District officials and Board of Education members. *See Jones v.*

*Bay Shore Union Free Sch. Dist.*, 170 F. Supp. 3d 420, 433 (E.D.N.Y. 2016), *aff'd*, No. 16-1000, 2016 WL 7402658 (2d Cir. Dec. 20, 2016). In *Jones*, the plaintiff sued a school district for, *inter alia*, banning him "from attending or speaking at a December 14, 2011 meeting of the District's Board of Education." *Id.* at 425. The plaintiff claimed that the prohibition was due to his advocacy for minority students, but the school district claimed that he "was prohibited from attending the meeting because of the prior practice of restricting [his] presence on campus, and the serious safety concerns raised by his desire to appear on campus and have access to students." *Id.* The court held that the plaintiff did "not put forth sufficient evidence to raise a triable issue of fact regarding whether Defendants' actions were motivated or substantially caused by Plaintiff's exercise of his right," and noted that school officials were "willing to meet with Plaintiff to discuss the establishment of a minority parents' association." *Id.* at 433. Moreover, the court observed that there was a "longstanding directive banning Plaintiff from District property" due to prior inappropriate contact with students that pre-dated the school's decision to exclude the plaintiff from the Board of Education meeting. *Id.* In affirming the district court, the Second Circuit held that "[n]o rational jury could conclude that the defendants were motivated by retaliatory animus rather than by legitimate concerns about student safety." 2016 WL 7402658, at *2.

Similarly, there is a substantial body of uncontroverted evidence demonstrating that the District banned plaintiff from its property due to his "continuing pattern of verbal abuse and threatening behavior towards school officials," and not on account of his advocacy for education technology or any other issue. *See Lovern*, 190 F.3d at 656. *Cf. Johnson v.*

*Perry*, 140 F. Supp. 3d 222, 227 (D. Conn. 2015), *appeal docketed*, No. 15-3671 (2d Cir. Nov. 13, 2015) (denying summary judgment because "whether plaintiff posed a danger to staff and children at the school is a disputed fact," and "[e]qually disputed is whether defendant banned plaintiff from school property based on a disagreement with the message plaintiff was conveying"); *Cyr*, 60 F. Supp. 3d at 547 n.8 (denying summary judgment because of, *inter alia*, disputed facts regarding whether ban from school property was based on threatening behavior or protected speech).

The May 23, 2013 letter from Lorentz specifically "address[ed] concerns . . . regarding representations made by [plaintiff], [plaintiff's] interactions with students and staff, and [plaintiff's] presence in District schools." (Gibson Aff. Ex. BB.) Moreover, the letter stated that it was "not [Lorentz's] intention to create an adversarial relationship with [plaintiff]" or to "*interfer[e] with [plaintiff's] right to discuss issues at Board meetings . . . .*" (*Id.* (emphasis added).) Thus, like *Jones*, it is clear that the District had no intention of restricting plaintiff's protected speech in support of education technology, school security, or any other legitimate issue, but was rather motivated to warn plaintiff because of his distressing behavior.

Similarly, Bardash-Eivers' July 3, 2013 correspondence stated that plaintiff's "communications with [her] and District staff ha[d] become increasingly combative," and that plaintiff had "personally confronted [Bardash-Eivers] in a combative manner, which [she] found to be unwarranted and upsetting." (Gibson Aff. Ex. DD.) Bardash-

Eivers' subsequent July 10, 2013 letter also mentioned "several years of [plaintiff's] e-mails, phone calls, and rants" (Gibson Aff. Ex. EE), and Lorentz's August 19, 2014 communication indicated that plaintiff had "threaten[ed] staff, confront[ed], harass[ed] or annoy[ed] Board Members, and fail[ed] to comply with the District's Code of Conduct . . . ." (Gibson Aff. Ex. GG.) The District sent plaintiff all of this correspondence over a fifteen-month period prior to prohibiting him from District property in September 2014, giving him ample notice that it was his alarming and disruptive conduct, and not his constitutionally-protected advocacy, that led to that ban and the subsequent embargos. *See Jones*, 170 F. Supp. 3d at 433. Given that the uncontroverted evidence shows that plaintiff repeatedly flouted those directives by leaving voicemails for District officials and Board of Education members, and by entering District schools without authorization, defendant exercised remarkable forbearance in continuing to permit plaintiff to attend Board of Education meetings during that period.

Accordingly, even when viewing the evidence most favorably to plaintiff, the Court determines that there are no triable issues of fact regarding plaintiff's First Amendment claim because plaintiff did not engage in protected conduct, and no rational jury could find that defendant's actions were motivated or substantially caused by such conduct.[19]

---

[19] Consequently, the Court need not reach defendant's argument that plaintiff cannot assert a First Amendment claim against the District under 42 U.S.C. § 1983 because he failed to adduce evidence of a municipal "policy or custom" that led to the constitutional injury at issue. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978).

## E. Due Process Claim

### 1. Applicable Law

In order to assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps.*, *UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation and emphasis omitted). Thus, a claimed violation of procedural due process involves a two-step analysis: (1) the court examines whether the State deprived plaintiff of a constitutionally protected interest, and (2) if so, the court determines whether the procedures surrounding that deprivation were constitutionally adequate. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

With respect to the second prong, ordinarily no pre-deprivation process is required so long as there exists an adequate post-deprivation remedy. *See Attallah v. N.Y. Coll. of Osteopathic Med.*, 94 F. Supp. 3d 448, 458 (E.D.N.Y. 2015) ("In sum, because an adequate post-deprivation remedy exists for review of plaintiff's expulsion, there can be no Fourteenth Amendment violation to support a Section 1983 claim." (citing, *inter alia*, *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880-82 (2d Cir. 1996))), *aff'd*, 643 F. App'x 7 (2d Cir. 2016), *cert. denied*, 2017 WL 69274 (U.S. Jan. 9, 2017); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984).[20]

### 2. Analysis

Plaintiff alleges in the SAC that "[b]y issuing no-trespass orders in a way that creates a high risk of the erroneous deprivation of rights, and by issuing a no-trespass order that deprived Jeff Roth of his rights without any meaningful opportunity to be heard to refute the order, the defendant has contravened the Fourteenth Amendment's guarantee of procedural due process." (SAC at 6.) Defendant argues that because "[a]ccess to school grounds . . . is not a protected liberty or property interest under New York State law," plaintiff cannot sustain a Due Process claim. (Def.'s Br. at 22.)

As the Court noted in the Memorandum and Order, defendant is correct that, under New York law, a plaintiff does not have a constitutionally protected liberty interest in accessing school property. *See, e.g.*, *Hone v. Cortland City Sch. Dist.*, 985 F. Supp. 262, 272 (N.D.N.Y. 1997) ("Looking to New York State law, the Court can find no support for the proposition that Plaintiff enjoyed any right of access to school property."); *Pearlman v. Cooperstown Cent. Sch. Dist.*, No. 3:01-CV-504 (TJM), 2003 WL 23723827, at *3 (N.D.N.Y. June 11, 2003) ("Plaintiff does not, however, cite to any state law or authority granting him unfettered access to school property, either as a citizen or a parent. Indeed, the New York Court of

---

[20] Although "the availability of post-deprivation procedures will not, ipso facto, satisfy due process" where established state procedures led to the deprivation at issue, there is nothing in the record that shows, and plaintiff does not argue, that the District was "'in a position to provide for predeprivation process.'" *Hellenic*, 101 F.3d at 880 (quoting *Hudson*, 468 U.S. at 534); *see also Attallah*, 643 F. App'x at 10 n.2.

Appeals has held that local school districts have great discretion in determining who shall have access to school property and school students."); *Silano v. Sag Harbor Union Free School Dist. Bd. of Educ.*, 42 F.3d 719, 724 (2d Cir. 1994) (finding board of education member did not have a protected liberty interest in visiting schools, and thus, that a temporary ban on his visits to the schools did not violate his due process rights). Thus, to the extent that plaintiff asserts a liberty interest in accessing the District's property, plaintiff's Fourteenth Amendment fails as a matter of law.[21]

Insofar as plaintiff raises a "stigma-plus" claim (SAC at 2) based on reputational harm inflicted by the ban from District property, "plaintiff must also demonstrate that his interests were deprived *without due process of law . . .*" *Attallah*, 94 F. Supp. 3d at 455; *see also Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006) ("Stated differently, the availability of adequate process defeats a stigma-plus claim." (citing *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)). Here, a meaningful post-deprivation remedy existed under Article 78 of the New York Civil Practice Laws and Rules ("Article 78"). *See Attallah*, 94 F. Supp. 3d at 455 ("In this case, the Court finds that plaintiff had an adequate post-deprivation remedy via a proceeding under Article 78."). It is well-settled that "an Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit." *Hellenic*, 101 F.3d at 881. Thus, "[g]enerally speaking, the availability

of an Article 78 proceeding bars seeking relief under Section 1983 when there is an adequate state post-deprivation procedure to remedy a random or arbitrary deprivation of property or liberty." *Attallah*, 94 F. Supp. 3d at 455. In *Jones*, the Second Circuit specifically recognized that the plaintiff "could have brought an Article 78 proceeding to challenge [his] temporary ban" from school district meetings. 2016 WL 7402658, at *2 n.2 (citing N.Y. Pub. Off. Law § 107) (holding that "[t]he presence of 'a meaningful postdeprivation remedy' for a deprivation not pursuant to 'established state procedure' means that the Due Process Clause was not violated" (citing *Hellenic*, 101 F.3d at 880)). In the instant case, similar to *Jones*, plaintiff could have challenged the District's decision to prohibit him from its building and grounds by commencing an Article 78 proceeding in New York State court.[22]

Thus, plaintiff's Due Process claim fails as a matter of law because he has not identified a constitutionally protected interest, and a constitutionally adequate post-deprivation procedure enabled plaintiff to challenge defendant's conduct under New York law.

F.  State Law Claims

Finally, in addition to his federal claims, plaintiff also asserts state causes of action for slander and violations of the New York Open Meetings and Freedom of Information Laws. Defendant argue that, upon dismissal of the federal claims, the Court should decline to

---

[21] Further, to the extent that plaintiff's Due Process claim is grounded in a deprivation of his First Amendment rights, *see Cyr*, 955 F. Supp. 2d at 296, the Court has already determined *supra* that no such violation occurred.

[22] Indeed, plaintiff appears to be aware of Article 78 because he previously filed an Article 78 petition to challenge his employment termination by another school district. *See Matter of Roth v. Manhasset Union Free Sch. Dist.*, 875 N.Y.S.2d 182 (2d Dep't 2009).

exercise supplemental jurisdiction over the state law claims. In his opposition, plaintiff does not challenge this argument.

Having determined that the federal claims against the District do not survive summary judgment, the Court concludes, in its discretion, that retaining jurisdiction over the state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claim because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and

fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Thus, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment, and it dismisses plaintiff's state law claims without prejudice to re-filing in state court.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment (ECF No. 71) as to plaintiff's federal Title VII, ADA, ADEA, First Amendment, and Fourteenth Amendment claims, and declines to exercise jurisdiction over plaintiff's remaining New York State law claims. The Clerk of the Court shall enter judgment accordingly and close this case. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Memorandum and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated:  January 30, 2017
       Central Islip, New York

\*\*\*

Plaintiff is proceeding *pro se*, 20 Frank Avenue, Farmingdale, New York 11735. Defendant is represented by Susan M. Gibson and Julie A. Torrey of Ingerman Smith, LLP, 150 Motor Parkway, Suite 400, Hauppauge, New York 11788.